**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PATRICIA A.E. MIROTH; STANLEY R. MIROTH, | No. 23-15759 |
| *Plaintiffs-Appellants*, | D.C. No. 2:22-cv-00460-KJM-JDP |
| v. | |
| COUNTY OF TRINITY; TRINITY COUNTY HEALTH AND HUMAN SERVICES; TRINITY COUNTY CHILD WELFARE SERVICES; LIZ HAMILTON; MARIO ANGELONE; NICOLE HAYES BRADFORD; ALLISON BALLARD; MEGAN SHOLTY-SCALZO; ANGELA BERGLUND; ASHLEY POQUETTE; VERLIN JOHNSON; DEBBIE CARTER, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted August 19, 2024
San Francisco, California

Filed May 8, 2025

Before:  Marsha S. Berzon, Daniel A. Bress, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge VanDyke

## SUMMARY[*]

### *Rooker-Feldman* Doctrine

The panel reversed the district court's dismissal, for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine, of a federal civil rights lawsuit alleging that county officials failed to provide social services to plaintiffs and committed fraud in state child custody proceedings.

After concluding that plaintiffs' children were at risk in the family home, defendants obtained warrants to take the children into protective custody. A California state court subsequently terminated plaintiffs' parental rights. Following unsuccessful appeals in state court, plaintiffs filed this lawsuit in federal court, alleging that defendants (1) failed to provide plaintiffs with social services required by state law, and (2) made false and misleading statements to the state court resulting in the termination of their parental rights. The district court dismissed the federal claims under the *Rooker-Feldman*

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

doctrine, finding that plaintiffs were seeking relief from the state court judgments, and declined to exercise jurisdiction over the state law claims.

The panel held that although plaintiffs' lawsuit may suffer from other infirmities, most notably preclusion, the *Rooker-Feldman* doctrine did not deprive the district court of subject matter jurisdiction over plaintiffs' claims. The *Rooker-Feldman* applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment. Here, plaintiffs' claims in their operative second complaint did not seek relief from or reversal of the state court's order. Rather, they sought money damages, asserting that defendants denied them services and made false claims to the court. Because these were legal wrongs by adverse parties that preceded the issuance of the state court order, the *Rooker-Feldman* doctrine did not apply.

Dissenting, Judge VanDyke agreed with the majority's statement of the law on the *Rooker-Feldman* doctrine, but disagreed with its application of that law to the unique circumstances in this case. Plaintiffs functionally sought a remedy for an injury directly caused by a state court judgment, placing this case squarely within *Rooker-Feldman*'s ambit. The claims in this case were all based on intrinsic fraud in the state court proceedings, where plaintiffs had an opportunity to present their claims and to rebut the supposed fraud, not extrinsic fraud that would have kept the state court from fully hearing plaintiffs' claims. When a litigant's asserted injury flows from the state court's decision and the litigant expressly disclaims, as in this case, that extrinsic fraud influenced that decision, then *Rooker-Feldman* applies. The majority's overly narrow articulation turns *Rooker-Feldman* into a mere pleading

requirement that can be easily circumvented. Judge VanDyke would affirm the district court.

## COUNSEL

Shannon C. Wilhite (argued), Shannon C. Wilhite Attorney at Law, Bayside, California, for Plaintiffs-Appellants.

John A. Whitesides (argued) and Serena M. Warner, Angelo Kilday & Kilduff, Sacramento, California; Debbie Carter, Pro Se, Susanville, California; for Defendants-Appellees.

## OPINION

BRESS, Circuit Judge:

Under the *Rooker-Feldman* doctrine, *see Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983), federal district courts lack subject matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). We consider this often-misunderstood doctrine in the context of a federal civil rights lawsuit alleging that county officials failed to provide social services and committed fraud in state child custody proceedings. Although the plaintiffs' lawsuit may suffer from other infirmities, most notably preclusion, the *Rooker-*

*Feldman* doctrine did not deprive the district court of jurisdiction.

We reverse and remand for further proceedings.

I

We recite the allegations of plaintiffs' operative second amended complaint. Plaintiffs Patricia and Stanley Miroth are the parents of minor children A.M. and S.M. After concluding that the children were at risk in the family home, officials in Trinity County, California obtained warrants to take the children into protective custody. Later, a California state court terminated the Miroths' parental rights. At the time they were taken into state custody, A.M. was five years old and S.M. was five days old.

The events that led to the Miroths losing custody of their children date back to February 2018, when the County's Child Welfare Services (CWS) received a report that Lonnie Smith, a registered sex offender and Patricia Miroth's stepfather, was living in the home. CWS employee Megan Sholty-Scalzo visited the Miroths' home and confirmed the report. No action was immediately taken; the Miroths allege that they were not told to remove Smith from the home. In spring 2018, CWS received reports that the Miroths were engaging in physical and verbal altercations with each other.

The Miroths contend that Sholty-Scalzo and other County officials were aware of the difficulties in the Miroth home but made no effort to create a state-required safety plan. Such a plan would have established a pathway for the Miroths to improve their home environment and maintain custody of the children. Between March 29, 2018, and April 30, 2018, Patricia Miroth left numerous phone messages and emails for Sholty-Scalzo seeking assistance. Sholty-Scalzo

allegedly did not return any of the messages. According to the second amended complaint, Sholty-Scalzo and other County officials improperly concluded, based on Patricia Miroth's past experiences involving her other children, that Patricia was incapable of improving as a parent, when a safety plan would have instead allowed the Miroths to establish goals and expectations that would help them maintain custody of A.M. and S.M.

In May 2018, CWS obtained a protective custody warrant to take custody of A.M., the only child in the house at the time. A warrant was similarly issued for S.M. following his birth in August 2018. In March 2019, the state court permanently terminated the Miroths' parental rights to A.M. and S.M. The Miroths' second amended complaint alleges that County defendants procured this result by defrauding the state court about Patricia Miroth's fitness as a parent and about whether the County had provided the Miroths with required social services. In particular, the Miroths allege that County officials before the state court (1) falsely stated that they provided services, when they failed to develop a safety plan; (2) misrepresented the facts surrounding the earlier termination of Patricia Miroth's parental rights for her other children; (3) falsely stated that Patricia Miroth used drugs; (4) withheld exculpatory evidence; and (5) lied to the court about whether the Miroths understood the nature of their actions, learned from their past mistakes, or made progress toward improving the atmosphere within the home.

Following unsuccessful appeals in state court, the Miroths in March 2022 filed this lawsuit in federal court against, *inter alia*, the County of Trinity, Sholty-Scalzo, and various County employees. The Miroths asserted various claims under 42 U.S.C. § 1983 and California law. In their

request for relief, the Miroths specifically asked the district court to "[r]everse the termination of TRISH and STAN's parental rights, and make orders to reunify children and parents." The Miroths subsequently filed a first amended complaint that similarly sought to void the decision of the state court, arguing that the "only just remedy [was] to reinstate their parental rights as to A.M. and S.M." Citing these explicit requests to overturn the state court judgment, the district court dismissed the Miroths' first amended complaint under the *Rooker-Feldman* doctrine, with leave to amend.

The Miroths then filed the operative second amended complaint. Unlike their two prior complaints, the Miroths this time dropped any request to reinstate their parental rights. Instead, they sought only money damages under § 1983 and state law.

The district court again dismissed the federal claims under the *Rooker-Feldman* doctrine and declined to exercise jurisdiction over the state law claims. The court held that because the Miroths "still essentially ask the court to review the rulings of the state court and find they were in error," the lawsuit remained "a forbidden de facto appeal" of a state court judgment. Although the Miroths were no longer asking to have their parental rights reinstated, they were nonetheless "assert[ing] the alleged errors of the state court as their legal injury." Because the Miroths had dropped certain allegations concerning "extrinsic fraud," the district court viewed their second amended complaint as "directly challenging the state court decisions."

After taking judicial notice of the records of the state court proceedings, the district court concluded that "all of the alleged fraud, misrepresentation[,] and omissions—

regarding the provision of services, drug use, counseling, removal of children over fourteen years ago, progress made by plaintiffs—were matters brought to the state court's attention . . . or were matters within plaintiffs' knowledge." The Miroths were also seeking "relief from the state court judgments" within the meaning of *Rooker-Feldman* because their federal lawsuit "seek[s] relief from the consequences of those judgments."

The district court dismissed the Miroths' second amended complaint without leave to amend. This appeal followed. We review the district court's dismissal for lack of jurisdiction under *Rooker-Feldman* de novo. *Noel v. Hall*, 341 F.3d 1148, 1154 (9th Cir. 2003).

II

A

With very limited exceptions, the United States Supreme Court is the only federal court empowered to review the final judgments of state courts. 28 U.S.C. § 1257(a); *Exxon Mobil*, 544 U.S. at 283; *Noel*, 341 F.3d at 1154–55. As a negative inference from this statutory grant of authority to the Supreme Court, federal district courts may not entertain appeals of state court judgments. *Exxon Mobil*, 544 U.S. at 283; *Noel*, 341 F.3d at 1154–55; *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004). An appeal of a state court judgment filed in federal district court—essentially an appeal filed in the wrong court—is a "forbidden de facto appeal" over which a district court lacks subject matter jurisdiction. *Kougasian*, 359 F.3d at 1139. This deceptively simple proposition, known as the *Rooker-Feldman* doctrine, has led to a good deal of misunderstanding over the years, with lower federal courts struggling to evaluate their

jurisdiction in cases involving parties who had previously litigated against each other in state court.

The Supreme Court has found that *Rooker-Feldman* precluded jurisdiction only twice, in the doctrine's eponymous cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). We begin our analysis with these cases, which demonstrate the limited scope of *Rooker-Feldman*'s restraint on the subject matter jurisdiction of federal district courts.

In *Rooker*, a litigant sought to have a federal district court declare an Indiana state court decision "null and void" based on the state court's legal errors in deciding the case. 263 U.S. at 414–15. The Supreme Court held that the dispute was "plainly not within the District Court's jurisdiction as defined by Congress." *Id.* at 415. Had the district court exercised jurisdiction, it would have been "an exercise of appellate jurisdiction," when "[t]he jurisdiction possessed by the District Courts is strictly original." *Id.* at 416. "Under the legislation of Congress, no court of the United States other than [the Supreme Court] could entertain a proceeding to reverse or modify the judgment for errors of that character." *Id.* Thus, the district court lacked subject matter jurisdiction over the suit.

In *Feldman*, decided sixty years later, Marc Feldman and Edward Hickey sought to practice law in the District of Columbia. Because the two had not studied at a law school accredited by the American Bar Association, the District of Columbia Court of Appeals denied them admission under a local court rule. 460 U.S. at 467–68, 470–72. Feldman and Hickey sought to have a federal district court overturn the D.C. Court of Appeals' decision. *Id.* at 468–69, 472–73.

But they also asked the federal court to find that the D.C. Court of Appeals had violated their due process rights by "act[ing] arbitrarily and capriciously in denying their petitions for [a] waiver" of the requirement that they study at an accredited school. *Id.* at 486; *see also id.* at 469 n.3.

The Supreme Court noted that Congress had in 1970 made "final judgments and decrees of the District of Columbia Court of Appeals . . . reviewable by the Supreme Court of the United States" on the same basis as decisions of state supreme courts. *Id.* at 464 (quoting 84 Stat. 475, D.C. Code § 11–102). When Congress had directed that review of an appeal from the D.C. Court of Appeals would take place in the Supreme Court, it divested lower courts of jurisdiction over these appeals, just as *Rooker* held that federal district courts lack jurisdiction over appeals from state courts. *Id.* Recognizing that Feldman and Hickey's first request was to overturn the D.C. Court of Appeals' determination, the Supreme Court held that they "should have sought review" in the Supreme Court, as "the District Court lacked subject matter jurisdiction over their complaints." *Id.* at 482.

Although the allegation that the D.C. Court of Appeals acted "arbitrarily and capriciously" was not a direct challenge to its judgment, the Supreme Court found that the district court also lacked subject matter jurisdiction to hear that claim. *Id.* at 486–87. The Supreme Court acknowledged that a "general challenge to the constitutionality" of the D.C. court's policy denying admission to applicants who had not graduated from an accredited law school would be within the district court's jurisdiction, as that would "not require review of a judicial decision in a particular case." *Id.* at 483, 487. But determining whether the D.C. court's decision was arbitrary

and capricious was "inextricably intertwined" with the D.C. court's decision to exclude Feldman and Hickey from the bar, rendering it also outside of the district court's jurisdiction. *Id.* at 486–87.

*Feldman*'s use of the phrase "inextricably intertwined" did not expand the universe of cases in which *Rooker-Feldman* deprives federal district courts of subject matter jurisdiction; it only sets the bounds of that deprivation within the context of a lawsuit in which the *Rooker-Feldman* doctrine already applies. Our decision in *Noel* explained this:

> The premise for the operation of the "inextricably intertwined" test in *Feldman* is that the federal plaintiff is seeking to bring a forbidden de facto appeal. The federal suit is not a forbidden de facto appeal because it is "inextricably intertwined" with something. Rather, it is simply a forbidden de facto appeal. Only when there is already a forbidden de facto appeal in federal court does the "inextricably intertwined" test come into play: Once a federal plaintiff seeks to bring a forbidden de facto appeal, as in *Feldman*, that federal plaintiff may not seek to litigate an issue that is "inextricably intertwined" with the state court judicial decision from which the forbidden de facto appeal is brought.

341 F.3d at 1158; *see also Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013) ("The 'inextricably intertwined' language from *Feldman* is not a test to determine whether a

claim is a de facto appeal, but is rather a second and distinct step in the *Rooker-Feldman* analysis. Should the action not contain a forbidden de facto appeal, the *Rooker-Feldman* inquiry ends.").

B

In the decades following *Feldman*, circuit courts diverged on the proper scope of the *Rooker-Feldman* doctrine. Our court took a circumscribed view in *Noel*, our seminal decision in this area. *Noel* held that "where the federal plaintiff does not complain of a legal injury caused by a state court judgment, but rather of a legal injury caused by an adverse party, *Rooker-Feldman* does not bar jurisdiction." *Noel*, 341 F.3d at 1163. Under this interpretation, "[i]t is a forbidden de facto appeal under *Rooker-Feldman* when the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court." *Id.* Outside of this narrow situation, when a plaintiff complains of harms caused by an adverse party in state court proceedings, the limits on federal courts' ability to grant relief come from doctrines of abstention and comity (if the federal plaintiff and adverse party are simultaneously litigating in state court) or doctrines of preclusion (if the state court suit has reached final judgment). *Id.* at 1163–64.

Unlike the Ninth Circuit, other circuits took an expansive view of *Rooker-Feldman* as depriving federal district courts of subject matter jurisdiction whenever the federal suit would imply the invalidity of a state court judgment or when it sought to litigate an issue that was or could have been raised in state court. One circuit, for example, said that "[t]he *Rooker-Feldman* doctrine is broad enough to bar all federal claims which were, or should have been, central to

the state court decision, even if those claims seek a form of relief that might not have been available from the state court." *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1333 (11th Cir. 2001); *see also, e.g.*, *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996) ("If the relief requested in the federal action requires determining that the state court decision is wrong or would void the state court's ruling, then . . . the district court has no subject matter jurisdiction to hear the suit." (quoting *Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995))); *Moccio v. N.Y. State Off. of Ct. Admin.*, 95 F.3d 195, 199 (2d Cir. 1996) (approvingly citing sources maintaining that "there is full overlap between the *Rooker-Feldman* doctrine and preclusion," and positing that *Rooker-Feldman* could "reach[] beyond those situations in which the federal action is precluded by res judicata or collateral estoppel").

In 2005, the Supreme Court put this debate to rest in *Exxon Mobil Corporation v. Saudi Basic Industries Corporation*, 544 U.S. 280, clarifying that *Rooker-Feldman* occupies only the "narrow ground" exemplified in the *Rooker* and *Feldman* cases themselves. *Id.* at 284. *Exxon Mobil* explained that some lower courts had construed *Rooker-Feldman* "to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress's conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738." *Id.* at 283. The Supreme Court rejected this broader take on *Rooker-Feldman*. And in doing so, its analysis tracked our reasoning in *Noel*—which *Exxon Mobil* approvingly cited. *See id.* at 293.

*Exxon Mobil* held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. The existence of a prior state court judgment and a federal plaintiff seeking to relitigate a matter already litigated in state court were not circumstances sufficient to invoke *Rooker-Feldman*, *Exxon Mobil* explained, even if the federal plaintiff's claim "denie[d] a legal conclusion that a state court has reached in a case to which he was a party." *Id.* at 293 (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). In that situation, "there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* (quoting *GASH Assocs.*, 995 F.2d at 728).

In the years since *Exxon Mobil*, and consistent with our earlier decision in *Noel*, we have continued to recognize the limited scope of *Rooker-Feldman*'s restriction on the subject matter jurisdiction of federal district courts. *See, e.g.*, *Cogan v. Trabucco*, 114 F.4th 1054, 1064 (9th Cir. 2024) ("Our caselaw has further narrowed the doctrine as applying only to suits alleging errors by the state courts in rendering judgment, as opposed to misconduct by litigants in obtaining such a judgment."); *Bell*, 709 F.3d at 897 ("The court erred by dismissing Plaintiffs' claims for retrospective relief under the *Rooker-Feldman* doctrine. Although Plaintiffs sought relief designed to remedy injuries suffered from a state court judgment, they did not allege before the court that the state court committed legal error, nor did they seek relief from the state court judgment itself."). Post-*Exxon Mobil*, the Supreme Court has likewise reiterated that the "cases since

*Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (per curiam).

Although application of *Rooker-Feldman* and preclusion doctrines can both lead to plaintiffs losing in federal court in the aftermath of a state court judgment, *Exxon Mobil* was clear that "*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine." 544 U.S. at 284. We have thus emphasized that *Rooker-Feldman* and preclusion "are analytically distinct." *Cogan*, 114 F.4th at 1064. *Rooker-Feldman* is a jurisdictional doctrine, whereas preclusion is not. *Exxon Mobil*, 544 U.S. at 293. Improperly dismissing for lack of subject matter jurisdiction under *Rooker-Feldman* is therefore material error, for federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given [to] them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Further, under 28 U.S.C. § 1738, the preclusive effect of state court judgments is a matter of state law, *Lance*, 546 U.S. at 466, whereas the reach of *Rooker-Feldman* is a question of federal law, *Cogan*, 114 F.4th at 1064. Equating *Rooker-Feldman* with preclusion "risks turning th[e] limited [*Rooker-Feldman*] doctrine into a uniform *federal* rule governing the preclusive effect of state-court judgments," contrary to 28 U.S.C. § 1738. *Lance*, 546 U.S. at 466.

In short, the Supreme Court's cases from *Rooker* and *Feldman* through *Exxon Mobil* and *Lance*, and our cases from *Noel* onward, confirm that "*Rooker-Feldman* is not simply preclusion by another name." *Lance*, 546 U.S. at 466. Concluding that a plaintiff's claims are barred by issue or claim preclusion does not mean that a court lacks subject matter jurisdiction under *Rooker-Feldman*.

C

Special difficulties can arise under *Rooker-Feldman* when the federal plaintiff sues an adverse party from a state court proceeding and claims that the adverse party fraudulently procured the state court judgment. Our cases make clear that while principles of preclusion may ultimately render the federal suit meritless, suits like this may be maintained without running afoul of *Rooker-Feldman*. Two of our cases are most relevant here: *Kougasian v. TMSL, Inc.*, 359 F.3d 1136 (9th Cir. 2004), and *Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021).

In *Kougasian*, the plaintiff, Dawn Kougasian, lost two wrongful death suits in California state court and then filed suit in federal court. 359 F.3d at 1138. In her federal complaint, she alleged, *inter alia*, that the defendants had filed a false declaration on which the state court dispositively relied, and that "defendants prevented her from challenging the declaration by presenting it to the court at the last minute and by refusing to provide the declarant's telephone number or address." *Id.* In one of her causes of action, Kougasian alleged that the defendants had obtained their judgments in state court "through extrinsic fraud on the court." *Id.* at 1139. Kougasian did not allege legal error by the state courts in rendering their judgments, but instead sought to "set aside these judgments based on the alleged extrinsic fraud by defendants that produced those judgments." *Id.*

We held that Kougasian's fraud-based claims did not violate the *Rooker-Feldman* doctrine. We explained that under California law, "extrinsic fraud"—"conduct which prevents a party from presenting his claim in court"—is a basis for setting aside a prior judgment. *Id.* at 1140 (quoting

*Wood v. McEwen*, 644 F.2d 797, 801 (9th Cir. 1981)).  Even though in this situation "[i]t is clear" that "the plaintiff is seeking to set aside a state court judgment," *Rooker-Feldman* still was not implicated because "[e]xtrinsic fraud on a court is, by definition, not an error by that court.  It is, rather, a wrongful act committed by the party or parties who engaged in the fraud."  *Id.* at 1140–41.  *Rooker-Feldman* therefore did not apply because Kougasian was alleging "a wrongful act by the adverse party" and not "legal error by the state court."  *Id.* at 1141; *see also Wallingford v. Bonta*, 82 F.4th 797, 819 (9th Cir. 2023) (Collins, J., dissenting) ("Although the plaintiffs' federal suit in *Kougasian* unquestionably *did* seek relief from the prior adverse state court judgments, we held that the [*Rooker-Feldman*] doctrine nonetheless did not apply because the plaintiffs were not 'alleging a legal error by the state court as the basis for that relief.'" (quoting *Kougasian*, 359 F.3d at 1140)).[1]

In *Benavidez*, which we decided after *Exxon Mobil*, a state juvenile court issued orders authorizing a medical examination of two children whom social workers had removed from their parents' home.  993 F.3d at 1140.  As a result of the orders, county officials conducted a "full body inspection" of the children, performed blood and urine tests, and administered vaccinations.  *Id.* at 1141.  The parents filed suit in federal court under 42 U.S.C. § 1983, claiming that the inspection of the children, without notice to or consent of the parents, violated the parents' constitutional rights.  *Id.* at 1140–41.  The parents alleged that the social workers had engaged in "judicial deception" by making

---

[1] The majority's decision in *Wallingford* did not reach the *Rooker-Feldman* issue because it dismissed the case on other jurisdictional grounds.  *See* 82 F.4th at 799.

misrepresentations to the juvenile court, which caused the court to order the examinations. *Id.* at 1144.

Although the medical examinations took place pursuant to an order of a state court, we held that *Rooker-Feldman* did not apply. *Id.* at 1143. "Despite the judicial context and intermediate step of the juvenile court Orders," we explained, the parents' "claims d[id] not seek relief from or reversal of the juvenile court's Orders." *Id.* The parents' claims were instead based on "a legal wrong by [the social workers] preceding the issuance of the Orders." *Id.* And these alleged wrongs could not "avoid scrutiny" under *Rooker-Feldman* merely "because they were successful in deceiving the juvenile court." *Id.* Indeed, we went on, "[e]ven if the [parents] had directly challenged the juvenile court decision, which they did not, the extrinsic fraud corollary to the *Rooker-Feldman* doctrine would apply" under *Kougasian*. *Id.* Because the parents did not learn of the medical examinations until later, they could have gone so far as to "directly challenge" the state court decision, without running afoul of *Rooker-Feldman*. *Id.* at 1144.

III

We now turn to whether the *Rooker-Feldman* doctrine deprived the district court of subject matter jurisdiction over the Miroths' claims. We hold it did not.

A

As we discussed above, the Miroths' second amended complaint can be broadly categorized into two types of allegations: that county officials (1) failed to provide the Miroths with social services required by state law, and (2) made false and misleading statements to the state court that caused the court to terminate the Miroths' parental rights

over A.M. and S.M. Neither allegation implicates the
*Rooker-Feldman* doctrine. Although that doctrine has
developed a reputation for complexity, the reasons it does
not apply here are straightforward.

*Rooker-Feldman* "applies only when the federal plaintiff
both asserts as her injury legal error or errors by the state
court *and* seeks as her remedy relief from the state court
judgment." *Kougasian*, 359 F.3d at 1140. Neither element
is met here. As an initial matter, as in *Benavidez*, "[d]espite
the judicial context and intermediate step of the [state] court
Orders, the [Miroths'] claims do not seek relief from or
reversal of the [state] court's Orders. Therefore, the *Rooker-
Feldman* doctrine does not serve as a jurisdictional bar to
their claims here." 993 F.3d at 1143. Although the Miroths
in prior iterations of their complaint did seek to set aside the
state court judgment and reinstate their parental rights, their
operative second complaint dropped these requests for relief.
This is a sufficient basis by which to conclude that the
*Rooker-Feldman* doctrine does not apply.

But beyond this, and perhaps more fundamentally, the
Miroths' second amended complaint does not contravene
*Rooker-Feldman* because it "does not assert 'as a legal
wrong an allegedly erroneous decision by a state court,' but
rather 'an allegedly illegal act or omission by an adverse
party.'" *Kougasian*, 359 F.3d at 1140 (quoting *Noel*, 341
F.3d at 1164). The Miroths' allegation that the defendants
failed to develop a required safety plan to ensure that the
Miroths could retain custody of the children asserts a wrong
by adverse parties, not the state court. The same is true of
the Miroths' allegations that the defendants defrauded the
state court into terminating the Miroths' parental rights. The
second amended complaint alleges that the defendants
"misrepresented" facts to the state court, "concealed known

facts from the Court," and "falsely represented facts, both written and oral." These are legal wrongs by adverse parties "preceding the issuance of" the state court orders. *Benavidez*, 993 F.3d at 1143. These "alleged legal wrongs by [adverse parties] cannot avoid scrutiny" under *Rooker-Feldman* merely because, by the allegations of the second amended complaint, "they were successful in deceiving the [state] court." *Id.* (quotations omitted). As we recently reiterated, "[o]ur caselaw has further narrowed the doctrine as applying only to suits alleging errors by the state courts in rendering judgment, as opposed to misconduct by litigants in obtaining such a judgment." *Cogan*, 114 F.4th at 1064. This principle governs here.[2]

Thus, *Rooker-Feldman* does not apply, and the district court had subject matter jurisdiction over the case.

B

The district court gave several reasons for finding that the *Rooker-Feldman* doctrine barred the Miroths' claims. The dissent echoes some of those grounds. Because of the confusion that *Rooker-Feldman* has engendered over the

---

[2] Our decision in *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855 (9th Cir. 2008), is distinguishable. In that case, we distinguished *Kougasian* because the plaintiffs' claim alleging fraud in state court foreclosure proceedings "was *itself* separately litigated before and rejected by an Oregon state court" in a second proceeding, after the plaintiffs filed a motion to vacate the state court judgment. *Id.* at 860 (emphasis in original). In that unique procedural context, we regarded the federal suit as a de facto appeal. No such "separate litigation" took place here. *Reusser* also presented a different *Rooker-Feldman* question because it involved the allegation that state court officers (judges, clerks, and sheriffs) were themselves part of the fraud. *Id.* at 858.

years, we take this opportunity to explain why the district court's reasoning was mistaken.

The district court first found that the Miroths "assert the alleged errors of the state court as their legal injury" because their second amended complaint dropped certain allegations of extrinsic fraud. According to the district court, this "withdrawal of the extrinsic fraud argument" was "dispositive," demonstrating that "plaintiffs are now directly challenging the state court decisions." The dissent endorses this theory as well.

This reasoning rests on a misunderstanding of both the Miroths' allegations and the relevance of formal allegations of extrinsic fraud to the *Rooker-Feldman* analysis. As to the former, the Miroths' original and first amended complaint both included two paragraphs of allegations, more in the form of legal argument, concerning extrinsic fraud. These paragraphs asserted that "extrinsic fraud exists in this case" and "is an exception to the *Rooker-Feldman* doctrine," and argued why *Rooker-Feldman* should not apply. The Miroths then removed these paragraphs from their second amended complaint. In the district court, the Miroths explained they had done so because once they were no longer "requesting relief in the form of a reversal of the state court decision," they were outside of *Rooker-Feldman* for that reason alone, and they therefore believed it was no longer necessary to allege extrinsic fraud.

The Miroths' removal of allegations (again, more legal argument) relating to extrinsic fraud did not create a *Rooker-Feldman* problem. The "extrinsic fraud corollary" to *Rooker-Feldman* comes into play when a federal plaintiff is "directly challeng[ing]" a state court decision. *Benavidez*, 993 F.3d at 1143. And the Miroths' second amended

complaint did not contain any such direct challenge because
it no longer sought to set aside the state court judgment.

Therefore, and although the Miroths could have perhaps
telegraphed their pleading strategy in a more accessible way,
the Miroths withdrawing the extrinsic fraud allegations did
not mean they were thereby alleging an injury caused by the
state court, based on the state court's legal errors. The
Miroths did not walk into a *Rooker-Feldman* sinkhole the
moment they excised "extrinsic fraud" from their complaint.
Instead, regardless of the legal labels attached to the
allegations, the second amended complaint alleges that
Sholty-Scalzo and other defendants defrauded the state court
into issuing its order terminating the Miroths' parental
rights. Those allegations assert wrongful conduct by adverse
parties in litigation, not by the state court itself. They thus
do not implicate *Rooker-Feldman*. *See Cogan*, 114 F.4th at
1064; *Benavidez*, 993 F.3d at 1143; *Kougasian*, 359 F.3d at
1139–41; *Noel*, 341 F.3d at 1155–57. The dissent's view
that the Miroths' asserted injuries "necessarily travel
through the state court's judgment" is inconsistent with
*Kougasian*, *Benavides*, and, indeed, our entire *Rooker-Feldman* jurisprudence.

The district court's analysis, and more so the dissent,
also rest on a broader misunderstanding of the analytical
relevance of extrinsic fraud allegations in the context of
*Rooker-Feldman*. As we described it in *Kougasian*, extrinsic
fraud is a specific type of fraud claim that, at least under
California law, provides a basis for setting aside a prior
judgment. *See Kougasian*, 359 F.3d at 1140 (citing *Zamora
v. Clayborn Contracting Grp., Inc.*, 47 P.3d 1056, 1063 (Cal.
2002)). And our point in *Kougasian* was that because
"[e]xtrinsic fraud on a court is, by definition, not an error by
that court" but, "rather, a wrongful act committed by the

party or parties who engaged in the fraud," it follows that *Rooker-Feldman* "does not bar subject matter jurisdiction when a federal plaintiff alleges a cause of action for extrinsic fraud on a state court." *Id.* at 1141.

But to say that allegations of extrinsic fraud definitionally do not cross *Rooker-Feldman* does not mean the absence of such allegations triggers *Rooker-Feldman*, even for fraud-based claims. Contrary to the dissent, we have never distinguished between so-called "intrinsic" fraud and extrinsic fraud in the *Rooker-Feldman* context. Nor would it be proper or helpful to import that state-law distinction into the federal-law question of the scope of the *Rooker-Feldman* doctrine.

Fraud allegations against an adverse party in litigation can avoid *Rooker-Feldman* even when they are not couched in extrinsic fraud terms. That was partially the case in *Kougasian*, in which we recognized that to the extent the plaintiff's fraud causes of action were not based in extrinsic fraud, they still did not countermand *Rooker-Feldman* because they were based on "alleged wrongful acts by the defendants." *Kougasian*, 359 F.3d at 1141; *see also id.* at 1140 n.1 (explaining that "[t]o the extent that Kougasian's two causes of action for fraud and for abuse of process are not based on extrinsic fraud, . . . [t]hey are nevertheless not barred by *Rooker-Feldman*, but for reasons given in the analysis in the next section of this opinion").

The same was true in *Benavidez*. There, we first held that the *Rooker-Feldman* doctrine did not apply because the plaintiffs "challenge[d] a legal wrong" by two social workers whose "alleged misrepresentation . . . caused the juvenile court to issue the Orders which authorized the medical examinations." *Benavidez*, 993 F.3d at 1143. We then went

on to address extrinsic fraud only as an alternative ground
for decision, on the assumption that the plaintiffs "had
directly challenged the juvenile court decision." *Id.* at 1143–
44.

These cases show, contrary to the dissent, that alleging
extrinsic fraud is one way of avoiding *Rooker-Feldman*, but
it is not somehow a requirement, even when one challenges
an adverse party's alleged misconduct in a prior state court
litigation. Indeed, if anything, it is the cause of action for
extrinsic fraud that created the closer *Rooker-Feldman*
question, because (at least under California law) it provides
the basis for setting aside a state court judgment. *See
Kougasian*, 359 F.3d at 1140–41 ("At first glance, a federal
suit alleging a cause of action for extrinsic fraud on a state
court might appear to come within the *Rooker–
Feldman* doctrine.").

To be sure, a plaintiff who cannot show extrinsic fraud,
*i.e.*, that he was *prevented* from presenting his fraud claim in
court, *id.* at 1140, may have a more difficult time avoiding
*preclusion* obstacles. But that does not change the fact that
a plaintiff alleging fraud by another party in litigation is not
alleging a legal error by the state court. *See Benavidez*, 993
F.3d at 1143; *Kougasian*, 359 F.3d at 1139–41.

This brings us to the second of the district court's main
rationales for finding that *Rooker-Feldman* applied, which is
that based on its review of the state court record, of which
the district court took judicial notice, "the state court heard
evidence regarding defendants' alleged misrepresentation"
and evidently found it unpersuasive, given that it terminated
the Miroths' parental rights. According to the district court,
"all of the alleged fraud, misrepresentation[,] and
omissions—regarding the provision of services, drug use,

counseling, removal of children over fourteen years ago, progress made by plaintiffs—were matters brought to the state court's attention . . . or were matters within plaintiffs' knowledge."

The problem with this reasoning is that it does not detract from or disprove the fact that plaintiffs are alleging "as a legal wrong an allegedly illegal act or omission by an adverse party," for which "*Rooker-Feldman* does not bar jurisdiction." *Kougasian*, 359 F.3d at 1140 (quoting *Noel*, 341 F.3d at 1164). A careful examination of the state court record may well lead to the conclusion that the Miroths' claims are barred by doctrines of preclusion (an issue we do not reach). But as the Supreme Court has made clear, "*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine," *Exxon Mobil*, 544 U.S. at 284, nor is *Rooker-Feldman* "simply preclusion by another name," *Lance*, 546 U.S. at 466. Even if the Miroths are raising matters that were raised or could have been raised in state court, that does not mean they are alleging legal errors by the state court or seeking review and rejection of the state court judgment itself. The former is the domain of preclusion doctrines; the latter is *Rooker-Feldman*, whose strictures are not met here.

Finally, the district court held, and the dissent agrees, that the Miroths "seek relief from the state court judgments" because through their damages requests, "plaintiffs are seeking relief from the consequence of those judgments." But "seek[ing] relief from a state court judgment," *Noel*, 341 F.3d at 1164, which can implicate *Rooker-Feldman*, is not the same thing as seeking relief that would ameliorate the effects of an adverse state court judgment. In past cases, plaintiffs sought such offsetting relief in the wake of an unfavorable state court judgment—and yet we held *Rooker-*

*Feldman* did not apply. *See, e.g.*, *Benavidez*, 993 F.3d at 1140–41; *Kougasian*, 359 F.3d at 1137–38; *Noel*, 341 F.3d at 1152–53. As we reasoned in one case, "[a]lthough Plaintiffs sought relief designed to remedy injuries suffered from a state court judgment, they did not allege before the court that the state court committed legal error, nor did they seek relief from the state court judgment itself." *Bell*, 709 F.3d at 897. Thus, *Rooker-Feldman* did not preclude jurisdiction. *Id.*

Here, moreover, the true "consequences" of the state court judgment is that the Miroths lost custody of their children. Nothing in the Miroths' second amended complaint, however, asks a federal court to address those consequences and reinstate the Miroths' parental rights or vacate or otherwise reverse the state court orders. It is these types of requests for relief that can present *Rooker-Feldman* problems. *See, e.g.*, *Exxon Mobil*, 544 U.S. at 291–92 (noting that in both *Rooker* and *Feldman*, the plaintiffs "called upon the District Court to overturn an injurious state-court judgment"); *Kougasian*, 359 F.3d at 1140 (noting that *Rooker-Feldman* applies only when a federal plaintiff "seeks as her remedy relief from the state court judgment"); *Noel*, 341 F.3d at 1156 (noting that the doctrine applies when a plaintiff "seeks to vacate or set aside the judgment of" a state court). But that is not the relief the Miroths sought here.

C

Our dissenting colleague offers some additional reasons why *Rooker-Feldman* should apply in this case. In our respectful view, the dissent's approach to *Rooker-Feldman* is well afield of the doctrine's proper scope. Whereas the district court's errors were premised in part on its misconstruing the Miroths' allegations, the dissent

misconstrues much about the *Rooker-Feldman* doctrine
itself. Indeed, the dissent's views, if accepted, would rewind
the clock to the bad old days in which some courts (though
not ours) improperly applied *Rooker-Feldman* whenever the
federal suit would cast doubt on a state court decision. The
dissent reflects an expansive vision of *Rooker-Feldman* that
the Supreme Court and this court have already rejected.

*First*, the dissent claims that the distinction between
injuries caused by a state court's legal errors in issuing a
judgment and an adverse party's wrongs in procuring that
judgment is a "mere semantic shift," because these injuries
"are the same thing." But a central premise of the *Rooker-
Feldman* doctrine, as properly understood, is that these are
not the same thing. Our cases could not be clearer:

> If a federal plaintiff asserts as a legal wrong
> an allegedly erroneous decision by a state
> court, and seeks relief from a state court
> judgment based on that decision, *Rooker-
> Feldman* bars subject matter jurisdiction in
> federal district court. If, on the other hand, a
> federal plaintiff asserts as a legal wrong an
> allegedly illegal act or omission by an
> adverse party, *Rooker-Feldman* does not bar
> jurisdiction.

*Noel*, 341 F.3d at 1164.

The dissent protests that in this case, none of the
defendants' allegedly false statements "injured plaintiffs
apart from the state court's judgment." According to the
dissent, "Plaintiffs were injured only because the state court
relied on those statements in ordering the removal of
plaintiffs' children." But when plaintiffs come to federal

court following the completion of state court proceedings
and raise allegations that relate to the same subject matter as
the state court litigation, the reason for the federal lawsuit,
inevitably, is dissatisfaction with the state court's decision.
Any of these cases could well be recharacterized as the
dissent recharacterizes this case, in which the "gravamen of
the plaintiffs' claimed injuries stems from the state court
judgment." And if that were true, *Rooker-Feldman* would
take hold whenever preclusion is implicated. Supreme Court
and Ninth Circuit precedent decidedly oppose that view,
directing us to "confine" *Rooker-Feldman* to "cases of the
kind from which the doctrine acquired its name"—cases that
bear no resemblance to this one. *Exxon Mobil*, 544 U.S. at
284. The dissent's position is also particularly inconsistent
with *Kougasian* and *Benavidez*, both cases in which the
defendants allegedly procured state court judgments by
fraud, and both cases in which we held the *Rooker-Feldman*
doctrine did not apply.

*Second*, the dissent emphasizes that the Miroths had
"ample opportunity" in state court to raise the fraud
allegations they raise here, and that "the state court
considered whatever responses the plaintiffs provided and
simply disagreed with them." But the dissent would once
again improperly fuse preclusion with *Rooker-Feldman*.
The Supreme Court has clearly held that a district court does
not lose subject matter jurisdiction "simply because a party
attempts to litigate in federal court a matter previously
litigated in state court." *Exxon Mobil*, 544 U.S. at 293.
Instead, "[i]f a federal plaintiff 'present[s] some independent
claim, albeit one that denies a legal conclusion that a state
court has reached in a case to which he was a party . . . , then
there is jurisdiction and state law determines whether the
defendant prevails under principles of preclusion.'" *Id.*

(quoting *GASH Assocs.*, 995 F.2d at 728). That the Miroths'
lawsuit, if successful, might imply the invalidity of the state
court's judgment does not mean that *Rooker-Feldman*
applies.

*Third*, the dissent modifies the legal standards to create
the misimpression that *Rooker-Feldman* is more embracing
than it really is. Seizing on our description of *Rooker-
Feldman* as encompassing "forbidden de facto appeal[s]" of
state court judgments, *Noel*, 341 F.3d at 1156, the dissent
claims that "[t]he use of words like 'de facto' . . . would be
unnecessary if *Rooker-Feldman* applied only to *express*
requests to reverse a state court." From this softening of
*Rooker-Feldman*'s core premise, the dissent then asserts that
the question under *Rooker-Feldman* is "whether the federal
suit is *effectively* a request for the federal court to remedy
harm caused by the state court's decision."

But the dissent's *Rooker-Feldman* is not the one the
Supreme Court has given us, which is "confined to" "cases
brought by state-court losers complaining of injuries caused
by state-court judgments rendered before the district court
proceedings commenced and inviting district court review
and rejection of those judgments." *Exxon Mobil*, 544 U.S.
at 284. Our use of the term "de facto appeal" does not
provide support for the dissent's self-described "functional"
approach to *Rooker-Feldman*. "De facto appeal" does not
mean a more flexible *Rooker-Feldman* than *Exxon Mobil* or
our cases allow. It simply means that a plaintiff has filed in
federal district court what should have been an appeal filed
in a higher state court or the Supreme Court. "Forbidden de
facto appeal" is the conclusion one reaches after applying the
proper tests for *Rooker-Feldman*; it is not itself the test. The
same is true of *Kougasian*'s use of the word "tantamount"
(which we quoted from *Barrow v. Hunton*, 99 U.S. (9 Otto)

80, 82–83 (1878)).  *See Kougasian*, 359 F.3d at 1141.  The
quotation of one word in one case did not usher in the
dissent's entirely different approach to the *Rooker-Feldman*
doctrine.

The dissent again manipulates the legal standards in
claiming that *Rooker-Feldman* applies because "plaintiffs'
relief 'is contingent upon a finding that the state court
decision was in error'" (quoting *Cooper v. Ramos*, 704 F.3d
772, 782 (9th Cir. 2012)).  This language from *Cooper* is
taken out of context.  In *Cooper*, we held that the plaintiff's
first claim was "a pure horizontal appeal of the state court's
decision" that "attacks the Superior Court judgment
explicitly." 704 F.3d at 779–80.  It therefore "simply cannot
be said that, here, Cooper, 'does not challenge the adverse
state court decision itself.'" *Id.* at 780 (brackets omitted)
(quoting *Skinner v. Switzer*, 562 U.S. 521, 532 (2011)).
*Rooker-Feldman* therefore applied.  We then held that the
remaining claims were "inextricably intertwined" with this
first claim. *Id.* at 781–83.

The "contingent upon" language on which the dissent
relies came from *Cooper*'s application of the "inextricably
intertwined" test.  But as we discussed above, our cases are
clear that "inextricably intertwined" "is not a test to
determine whether a claim is a de facto appeal." *Bell*, 709
F.3d at 897.  Instead, "[o]ur circuit has emphasized that
'[o]nly when there is already a forbidden de facto appeal in
federal court does the 'inextricably intertwined' test come
into play." *Cooper*, 704 F.3d at 778 (quoting *Noel*, 341 F.3d
at 1158).  The dissent therefore again miscasts language
from our cases to suggest that *Rooker-Feldman*'s expanse is
broader than precedent directs.

*Fourth*, the dissent claims that our decision conflicts with decisions from other circuits. That charge is unfounded and once again exemplifies the dissent's misunderstanding of the *Rooker-Feldman* doctrine. Some of the cases the dissent cites held that the *Rooker-Feldman* doctrine did not apply. *See Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 173 (3d Cir. 2010); *McCormick v. Braverman*, 451 F.3d 382, 392–93 (6th Cir. 2006). And in other cases the dissent cites, courts held that *Rooker-Feldman* barred jurisdiction when the plaintiff sought to overturn the state court judgment itself. *See, e.g.*, *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 383 (6th Cir. 2021) (holding that *Rooker-Feldman* applied when the plaintiff "filed a complaint in federal court alleging that the [state court] Order was unconstitutional and inconsistent with Tennessee law, asking the federal court to enjoin the Order's enforcement"); *Klimowicz v. Deutsche Bank Nat'l Tr. Co.*, 907 F.3d 61, 66 (1st Cir. 2018) (holding that *Rooker-Feldman* applied because "the plaintiff's federal suit sought to vacate and set aside the Land Court's final judgment of foreclosure," "which would include enjoining enforcement of the Housing Court's Order"). These cases all support our decision in this case, as well as the recognized distinctions that we follow—distinctions the dissent elides.

The dissent's heavy reliance on *Hoblock v. Albany County Board of Elections*, 422 F.3d 77 (2d Cir. 2005), likewise demonstrates its misperception of governing law. Invoking a hypothetical lawsuit of a parent challenging a state court child custody termination, the Second Circuit observed that "[i]f the father sues in federal court for the return of his son on grounds that the judgment violates his federal substantive due-process right as a parent, he is complaining of an injury caused by the state judgment and

seeking its reversal." *Id.* at 87. That is true, but what the Miroths are seeking here is different; they are not requesting the return of their children. Continuing its hypothetical, the Second Circuit further observed that if the father were to allege that he was injured by state employees who took his child "pursuant to a state judgment," that would also implicate *Rooker-Feldman*. *Id.* at 88. But the reason for this, the Second Circuit made clear, was because the state employees' actions were "*produced by* a state-court judgment." *Id.* (emphasis added).

The Miroths are not challenging the actions of County officials that were "pursuant to" or "produced by" a state court judgment, *i.e.*, their actions *executing* the judgment. The Miroths are instead alleging that the County fraudulently procured the judgment, which is conduct by adverse parties that preceded the judgment. And again, the cases are clear that such suits can be maintained without crossing *Rooker-Feldman*. It bears repeating: "[o]ur caselaw has further narrowed the doctrine as applying only to suits alleging errors by the state courts in rendering judgment, as opposed to misconduct by litigants in obtaining such a judgment." *Cogan*, 114 F.4th at 1064. That was the nature of the claims in both *Benavides* and *Kougasian*, in which we held that the *Rooker-Feldman* doctrine did not apply. *Benavidez*, 993 F.3d at 1143; *Kougasian*, 359 F.3d at 1139–41. Indeed, that was the nature of the claims in cases the dissent cites, in which courts likewise held that the *Rooker-Feldman* doctrine did not bar jurisdiction. *See McCormick*, 451 F.3d at 392 (holding that *Rooker-Feldman* did not apply because "Plaintiff asserts *independent claims* that those state court judgments were produced by certain Defendants through fraud, misrepresentation, or other improper means"); *Great W. Mining & Min. Co.*, 615 F.3d at 170–73

(same, citing like cases from the Seventh Circuit); *see also, e.g.*, *Behr v. Campbell*, 8 F.4th 1206, 1213–14 (11th Cir. 2021) (holding that *Rooker-Feldman* did not bar claims alleging that adverse parties committed fraud in state child custody proceedings).

*Finally*, the dissent repeatedly expresses concern about our assertedly narrow application of *Rooker-Feldman* and the possibility that plaintiffs may craft pleadings to avoid *Rooker-Feldman*'s prohibition on de facto appeals. Neither concern is warranted. Although we of course agree with the dissent that there is no "express" language or "specific words requirement" for *Rooker-Feldman* to apply, narrowness is a hallmark of the *Rooker-Feldman* doctrine. The cases repeatedly drive this point home. *See Exxon Mobil*, 544 U.S. at 284 (referring to the "narrow ground occupied by *Rooker-Feldman*"); *id.* at 291 (making clear the doctrine applies only in "limited circumstances"); *Lance*, 546 U.S. at 464 ("[O]ur cases since *Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule."); *id.* ("narrow doctrine"); *Cooper*, 704 F.3d at 778 ("very sparing" doctrine); *Behr*, 8 F.4th at 1212 ("In short, district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply."). Indeed, the Supreme Court has found that the doctrine precluded jurisdiction only twice. *See Exxon Mobil*, 544 U.S. at 283 (citing *Rooker* and *Feldman*). The dissent's concern with our application of *Rooker-Feldman* is simply a disagreement with the limited manner in which the doctrine operates.

Nor is there any reason to be concerned about the supposed ill of pleadings that are carefully drafted to avoid *Rooker-Feldman*. There is nothing new about plaintiffs drafting complaints to account for jurisdictional or other procedural impediments. And as our case law demonstrates,

plaintiffs are entitled to bring challenges that do not run afoul
of *Rooker-Feldman*. This is not a mere matter of pleading
particular words or phrases, as the dissent supposes, but a
question of the relief plaintiffs seek and whether they are
alleging a legal wrong by an adverse party. In any event,
*Rooker-Feldman* is not the only doctrine responsive to the
broader issue of federal lawsuits that seek to relitigate state
court proceedings. Although the dissent seems to envision a
world in which these lawsuits will proceed if *Rooker-
Feldman* does not apply, doctrines of preclusion play a
significant role in this context, placing important limits on
the re-do of state court cases in federal court. *Rooker-
Feldman* not applying does not mean a lawsuit will make it
very far if other doctrines, such as preclusion, stand in the
way.

In fact, perhaps aware that *Rooker-Feldman* presented a
difficult basis for affirmance, the defendants led off their
answering brief by asking us to affirm on the alternative
ground that the Miroths' claims are barred under principles
of preclusion. As we noted above, many of the district
court's findings, based upon its considered review of the
state court record, are relevant to an analysis of both issue
and claim preclusion. But because the district court did not
address the case through the legal lens of preclusion, and
because the underlying state court records were not made
part of the record on appeal, we believe the better course is
for the district court to take up the preclusion question in the
first instance, on remand.

IV

We appreciate that when plaintiffs file lawsuits in federal
court after losing in state court, district courts may naturally
and appropriately anticipate that the federal case could fail

procedurally, based on various doctrines designed to promote finality of litigation and respect for state courts. Many cases in which *Rooker-Feldman* is raised involve determined litigants, sometimes without legal representation, who may offer prolix allegations concerning not just the underlying facts but the lengthy history of their prior litigation efforts. We understand that working through these cases can present challenges for district courts. And in this case, although we conclude that the district court erred in dismissing for lack of jurisdiction under *Rooker-Feldman*, we commend the district court for conscientiously examining the state court record and the various iterations of the plaintiffs' complaint, in the face of allegations that were sometimes unclear.

The teaching of *Exxon Mobil*, *Noel*, and the other precedents in this area is that district courts encountering lawsuits brought by disappointed state court litigants may not regard the fact of a state court judgment as reason sufficient to dismiss the case for lack of subject matter jurisdiction under *Rooker-Feldman*. Because federal courts cannot disavow the jurisdiction granted to them, there is an important distinction between dismissal under *Rooker-Feldman* and rejecting a claim based on preclusion or some other ground. Our decision today reaffirms that delineation.

**REVERSED AND REMANDED.**

VANDYKE, Circuit Judge, dissenting:

I agree with the majority's statement of the law on the *Rooker-Feldman* doctrine. But I disagree with its application of that law to the unique circumstances in this case. What makes this case unique is twofold. First, it is clear from reviewing their operative complaint that the gravamen of plaintiffs' claimed injuries stems from the state court judgment removing their children. Second, and critically, plaintiffs have expressly disclaimed any extrinsic fraud by defendants in the state court proceedings, meaning that no act or omission independent of those proceedings prevented plaintiffs from presenting their case to the state court. As a result, plaintiffs functionally seek a remedy for an injury directly caused by a state court judgment, placing this case squarely within *Rooker-Feldman*'s ambit. I would thus affirm the district court. To hold otherwise essentially narrows *Rooker-Feldman* out of existence by treating it as a mere pleading rule.

A.

The majority correctly explains that *Rooker-Feldman* applies only in limited circumstances, yet the doctrine "has sometimes been construed to extend far beyond [its] contours." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). Properly understood, "*Rooker-Feldman* prohibits a federal district court from exercising subject matter jurisdiction over a suit that is a de facto appeal from a state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004). A de facto appeal exists when a plaintiff both "asserts as a legal wrong an allegedly erroneous decision by a state court" *and* "seeks relief from a state court judgment based on that decision." *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003).

But we have never construed *Rooker-Feldman* so narrowly that it applies only in those situations where the plaintiff expressly asks a federal court to overturn the state court decision. To the contrary, we have acknowledged that the doctrine applies to "forbidden" challenges that are "de facto appeal[s] … 'tantamount to … moving to set aside a judgment.'" *Kougasian*, 359 F.3d at 1139–41 (quoting *Barrow v. Hunton*, 99 U.S. (9 Otto) 80, 82–83 (1878)). The use of words like "de facto" and "tantamount" in reference to the doctrine would be unnecessary if *Rooker-Feldman* applied only to *express* requests to reverse a state court. *See Noel*, 341 F.3d at 1155 ("*Rooker-Feldman* becomes difficult—and, in practical reality, only comes into play as a contested issue—when a disappointed party seeks to take not a formal direct appeal, but rather its de facto equivalent, to a federal district court."). Instead, cases have focused on whether the two conditions recited in *Noel* are met, without imposing a specific words requirement. *See, e.g.*, *Kougasian*, 359 F.3d at 1139–40 (finding one of the two conditions unmet after thoroughly evaluating the actual source of the alleged legal wrong). Or put slightly differently, in applying *Rooker-Feldman*, we have asked whether the federal suit is *effectively* a request for the federal court to remedy harm caused by the state court's decision, not just whether the federal plaintiff is *expressly* asking us to reverse the state court.

Here, while plaintiffs have amended their most recent complaint to remove their prior requests for relief expressly directed at the state court, their federal claims continue to demand relief that is predicated on the state court having committed "a legal wrong" against them by ordering the removal of their children, and "seek[ing] relief" from the results of that "state court … decision." *Noel*, 341 F.3d at

1164. And plaintiffs have made clear they are not claiming that some extrinsic fraud by defendants prevented them from presenting their case to the state court. Their federal claims are therefore barred by *Rooker-Feldman*.

B.

The majority provides a few reasons for its different conclusion. To begin, it emphasizes that plaintiffs are no longer *expressly* asking the district court to reverse the state court judgment. True, plaintiffs now only request monetary damages to remedy the direct results of the state court decision—specifically, the state court's removal and continued detention of plaintiffs' two children. But the fact that their current complaint asks only for monetary relief rather than a direct reversal does not necessarily mean *Rooker-Feldman* is inapplicable because their "prayer for relief in the form of monetary and punitive damages" continues to be "contingent upon a finding that the state court decision was in error." *Cooper v. Ramos*, 704 F.3d 772, 782 (9th Cir. 2012). "It is precisely this sort of horizontal review of state court decisions that the *Rooker-Feldman* doctrine bars." *Id.*

Notably, plaintiffs initially asked the district court to set aside the state court judgment by demanding that the federal court reinstate their parental rights. This obviously violated *Rooker-Feldman*. After the district court properly dismissed their earlier complaint for that reason, plaintiffs amended their complaint to drop their direct requests to reverse the state court. But the thrust of plaintiffs' allegations remains unchanged: they continue to seek a remedy for the state court's termination of their parental rights. If dropping the explicit request to set aside a state court judgment controlled whether *Rooker-Feldman* applies, a de facto appeal could

proceed whenever a party functionally—but not expressly—challenges the state judgment. *Rooker-Feldman* would essentially be reduced to a matter of careful pleading. To my knowledge, no court has ever characterized the doctrine as simply a pleading requirement. Quite the opposite: "Can a federal plaintiff avoid *Rooker-Feldman* simply by clever pleading … by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself? Surely not." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005); *see also Klimowicz v. Deutsche Bank Nat. Tr. Co.*, 907 F.3d 61, 65 (1st Cir. 2018) ("Nor can the plaintiff evade the reach of the *Rooker-Feldman* doctrine by artful pleading."); *May v. Morgan Cnty.*, 878 F.3d 1001, 1005 (11th Cir. 2017) ("Although narrow in its application, a state court loser cannot avoid *Rooker-Feldman*'s bar by cleverly cloaking her pleadings in the cloth of a different claim. Pretext is not tolerated.").

For *Rooker-Feldman* to serve its narrow but important purpose, a party's creative word choice can't artificially cabin the doctrine. The district court in this case correctly recognized that, "in effect, plaintiffs are asking the court to scrutinize the decisions of the state courts" in order to obtain "relief from the consequences of those judgments." At its core, plaintiffs' amended complaint still "seeks relief from a state court judgment." *Noel*, 341 F.3d at 1164. *Rooker-Feldman* applies because "'the injury of which [plaintiffs] complain[] was caused by the [state court] judgment, … [and] [plaintiffs] did not suffer an injury out of court and then fail to get relief from [the] state court; [their] injury came from the [state court] judgment.'" *Id.* at 1164–65 (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 729 (7th Cir. 1993)). The relief they seek falls squarely within "cases

of the kind … brought by state-court losers complaining of injuries caused by state-court judgments … and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284. Omitting their express request for reversal did not meaningfully transform either the source of plaintiffs' injury—the state court judgment—or the fact that they are asking the federal court to remedy that injury. Where, as here, a plaintiff seeks such a functional reversal of the state court, *Rooker-Feldman* applies.

C.

The majority also finds dispositive plaintiffs' recharacterization of the asserted legal error as one caused by their adverse party rather than the state court itself. But this mere semantic shift does not change the fact that the gravamen of plaintiffs' asserted injuries results entirely from the state court ordering the removal of their children. In literally every case where a plaintiff asks the federal court to remedy an injury directly resulting from a state court judgment, the plaintiff can always easily recharacterize their injury as resulting not from the state court judgment itself but from their state court adversary convincing the state court to issue that unfavorable judgment. Those are the same thing. And again, I'm not aware of any decision concluding that *Rooker-Feldman* is so easily pled around.

Looking at the thrust of plaintiffs' causes of action in this case, the asserted injuries clearly result directly from the state court's judgment. In their first three claims, for example, plaintiffs contend that defendants made false statements to the state court on which that court relied. But none of those statements injured plaintiffs apart from the

state court's judgment.[1]  Plaintiffs were injured only because
the state court relied on those statements in ordering the
removal of plaintiffs' children.  After considering all the
evidence and arguments from both sides, the state court—
not the defendants—ordered that plaintiffs' children should
be removed.  It is *that* decision by the state court that caused
the injury that plaintiffs still seek to remedy in federal court.

To be fair, there are a few factual allegations scattered
throughout plaintiffs' amended complaint that *could* be
viewed as direct injuries resulting from a source other than
the state court.  For example, plaintiffs argued that child
abuse investigators failed in "the[ir] duty to investigate
information that would clarify matters prior to separating
children from their parents."  The same investigators also
allegedly failed their "legal duty to provide a safety plan."
Be that as it may, plaintiffs have not asserted any
*independent* claims of injury based on these allegations.  *Cf.
Noel*, 341 F.3d at 1164 ("'The *Rooker-Feldman* doctrine
asks … [if] the federal plaintiff [is] seeking to set aside a
state judgment, or does he present some independent
claim.'" (quoting *GASH*, 995 F.2d at 728–29)).  Instead,
these alleged failures to investigate and provide a safety plan
were made in service of the claims regarding the removal of
plaintiffs' children. And plaintiffs' requested relief confirms
they sought no standalone relief based on defendants' failed
duties.  So these allegations do not supply a way around

---

[1] Even if these statements could be construed as *allegations* of extrinsic
fraud had plaintiffs not disclaimed extrinsic fraud, a federal court would
need to determine whether those allegations actually demonstrated
extrinsic fraud to justify an exception to *Rooker-Feldman*'s jurisdictional
bar.  *See Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 858–60 (9th
Cir. 2008).  But there is no need to explore that question here because
plaintiffs disclaimed any extrinsic fraud.

*Rooker-Feldman* because these injuries necessarily travel through the state court's judgment ordering the removal of plaintiffs' children.

That defendants supposedly misled the state court during court proceedings to reach an allegedly wrong decision doesn't change the reality that plaintiffs' relief "is contingent upon a finding that the state court decision was in error." *Cooper*, 704 F.3d at 782. Again, it will always be true, in any case where plaintiffs are "alleging injury caused *by* a state court judgment," *Noel*, 341 F.3d at 1165 (citation omitted), that the same injury could also be recharacterized as resulting (even if less directly) from the plaintiffs' state court adversaries wrongly convincing the state court to issue that judgment. Regardless, this "is precisely th[e] sort of horizontal review of state court decisions that the *Rooker-Feldman* doctrine bars." *Cooper*, 704 F.3d at 782.

Our court has recognized only one exception to *Rooker-Feldman* where, as here, the state court loser is harmed by the state court judgment. *Reusser*, 525 F.3d at 859 (collecting cases). Where that harm results from some *extrinsic* fraud by the state court winner who prevented the state court loser from even being able to present his case to the state court, *Rooker-Feldman* does not apply. Examples of such extrinsic fraud include hiding the identity of witnesses from your opponent or the state court, *see Kougasian*, 359 F.3d at 1138, or failing to make mandatory disclosures to your opponent, *see Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1143–44 (9th Cir. 2021).

Extrinsic fraud is distinguishable from a plaintiff claiming *intrinsic* fraud—that is, where the state court loser instead claims that the defendant directly misled the state court, perhaps by perjury or misrepresenting facts in court.

*See Intrinsic Fraud*, Black's Law Dictionary (12th ed. 2024) (providing examples such as the "use of fabricated evidence, perjured testimony, and false receipts"). Intrinsic fraud is "distinguished" from extrinsic fraud because the former goes "to the very heart of the issues contested in the state court action," and because that type of fraud happened before the state court where plaintiffs "clearly had an opportunity to present their claim" and rebut the supposed fraud. *Green v. Ancora-Citronelle Corp.*, 577 F.2d 1380, 1384 (9th Cir. 1978). Unlike extrinsic fraud, claims of intrinsic fraud are not an exception to the *Rooker-Feldman* doctrine, presumably because in every case where a federal plaintiff is claiming injury directly from a state court judgment they could just as easily recharacterize that injury as resulting from their state court opponent "misleading" the state court into ruling against them. Such an exception to *Rooker-Feldman* for intrinsic fraud claims would entirely swallow the rule.

Plaintiffs' claims in this case are all based on *intrinsic* fraud, not extrinsic fraud. We know that because plaintiffs in the litigation below disclaimed that they were alleging any extrinsic fraud by defendants. The majority nonetheless refuses to apply *Rooker-Feldman* because plaintiffs' amended complaint "does not assert 'as a legal wrong an allegedly erroneous decision by a state court,' but rather 'an allegedly illegal act or omission by an adverse party.'" But this ignores the important difference between claims of intrinsic fraud and extrinsic fraud. It is true that every claim of intrinsic fraud can be characterized as a legal wrong committed by an adverse party. But when you do that and then so rely as the majority does here to conclude that *Rooker-Feldman* is inapplicable, you effectively eviscerate *Rooker-Feldman* because every injury directly resulting

from a state court judgment *also* results from the adverse party having (allegedly) misled the state court into issuing that judgment.

Absent some extrinsic fraud that kept the state court from fully hearing plaintiffs' claims—which again, plaintiffs have expressly disclaimed here—the exception to *Rooker-Feldman* does not apply.  No matter how plaintiffs recharacterize their federal case, it is still the state court's removal of their children that caused the relevant injury plaintiffs now seek to remedy.  The district court thus correctly found "withdrawal of the extrinsic fraud … dispositive here."

D.

The majority allocates a lot of space to opining about matters with which I don't disagree.  But in the areas where I do disagree a few responses are warranted.

First, the majority characterizes my position as so broad that it "would rewind the clock to the bad old days in which some courts … improperly applied *Rooker-Feldman* whenever the federal suit would cast doubt on a state court decision."  Not so.  My position is very narrow: when a litigant's asserted injury flows from the state court's decision and the litigant expressly *disclaims* that extrinsic fraud influenced that decision, then *Rooker-Feldman* applies.  Indeed, my position is so narrow that I question whether it would ever apply to a future case because it will be the exceedingly unusual circumstance where a litigant would expressly disclaim extrinsic fraud.  It is the disclaimer of extrinsic fraud that does the work for me here.  I agree with the majority that plaintiffs "did not walk into a *Rooker-Feldman* sinkhole the moment they excised 'extrinsic fraud'

from their complaint." Plaintiffs walked into that sinkhole the moment they expressly disclaimed extrinsic fraud.

The majority's attempt to explain why *Rooker-Feldman* doesn't apply is not particularly responsive to *this* unique circumstance. Indeed, the majority's position essentially collapses extrinsic fraud and intrinsic fraud into one combined category of fraud while ignoring our prior precedents that specifically refer to these distinct types of fraud. *See, e.g.*, *Kougasian*, 359 F.3d at 1138; *Benavidez*, 993 F.3d at 1143–44. It can't be correct that the adjectives "extrinsic" and "intrinsic" have no meaning. And my position is wholly consistent with both *Kougasian* and *Benavidez*—where *Rooker-Feldman* did not apply—because those defendants allegedly procured the state court judgment by *extrinsic* fraud rather than simply "by fraud." By excising the adjective "extrinsic" to simply say that *Rooker-Feldman* does not apply despite the fraud allegation, the majority fails to appreciate the distinct analytical consequences that flow from each type of fraud allegation.

Second, when you cut through the majority's strawman discussion that is irrelevant to the narrow circumstance on which I'm focused—where a litigant, as here, disclaims extrinsic fraud—the majority's alarming, and wholly unnecessary, conclusion is laid bare: *Rooker-Feldman* applies only when a litigant *expressly asks* to reverse a state court judgment. This is precisely what plaintiffs did in their original complaint. And once plaintiffs amended their complaint to remove the express requests for reversal, the majority contends doing so placed them "outside of *Rooker-Feldman* for that reason alone." The majority's simple articulation of the doctrine notwithstanding, the rule it creates today causes serious tension with cases in our court as well as other circuits.

Start with our court. I've already explained that our cases specifically describe *Rooker-Feldman* as barring "de facto" appeals of state court judgments and efforts "tantamount" to an appeal of a state court judgment. *Kougasian*, 359 F.3d at 1139–41. But it is worth reiterating that the use of such descriptors for *Rooker-Feldman* would be pointless if the doctrine applied only to express requests for reversal of a state court judgment. When the majority reads *Rooker-Feldman* as applying only when a litigant expressly seeks to set aside a state court judgment, it is important to recognize just how remarkable this contention is. To be sure, our court has stressed the narrowness of the *Rooker-Feldman* doctrine. But we have never before described it as *that* narrow. *See Cooper*, 704 F.3d at 777 ("The doctrine bars a district court from exercising jurisdiction not only over an action explicitly styled as a direct appeal, but also over the 'de facto equivalent' of such an appeal." (quoting *Noel*, 341 F.3d at 1155)). I don't know why we would use terms like "de facto" and "tantamount" if *Rooker-Feldman* was as exceedingly narrow as the majority characterizes it.[2]

---

[2] The majority accuses me of "manipulat[ing] the legal standards" by relying on "language from *Cooper* [that] is taken out of context" because it pertains to the application of the "inextricably intertwined" test. But *Cooper* is not so easily distinguished from this case. While our court characterized the plaintiff's first claim in *Cooper* as "a pure horizontal appeal of the state court's decision," 704 F.3d at 779–80, just like in this case that "pure horizontal appeal" did not expressly request the reversal of the state court's decision, *see* Compl. at 22–23, *Cooper v. Ramos*, No. 2:11-cv-03942-SVW-OP (C.D. Cal. May 6, 2011). Instead, the complaint in *Cooper* merely alleged that the state court's harmful decision resulted from "misleading and factually erroneous information" submitted by the adverse party during the state court proceedings. *Id.* at

The majority's overly narrow articulation that turns *Rooker-Feldman* into a pleading rule also causes unnecessary tension with other circuits. Other circuit courts recognize that *Rooker-Feldman* requires an examination of the actual "source of the injury." *Hoblock*, 422 F.3d at 87; *see also RLR Investments, LLC v. City of Pigeon Forge*, 4 F.4th 380, 388 (6th Cir. 2021); *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166–68 (3d Cir. 2010). Such an examination would be wholly unnecessary if the rule was truly as the majority posits: that a litigant must expressly request the reversal of a state court judgment. That would always be an easy inquiry and would not have caused the doctrine to "develop[] a reputation for complexity." *See RLR Investments*, 4 F.4th at 387–88 ("Usually *Rooker-Feldman* cases are complicated because it's difficult to determine if a plaintiff seeks review of a state-court decision … or if a decision counts as a judgment…. 'But there's no complexity when the litigant directly asks a federal district court to declare a state-court order to be unconstitutional and enjoin its enforcement.'" (citations omitted)).

The Second Circuit has further explained how this "source of the injury" inquiry would operate in a circumstance similar to the one before us:

> Suppose a state court, based purely on state law, terminates a father's parental rights and

---

22. The same is true here: plaintiffs contend the state court relied on misleading and fraudulent statements to reach the harmful decision to remove their children. Because, just like in *Cooper*, "there is already a forbidden de facto appeal" in plaintiffs' first three causes of action here, "the 'inextricably intertwined' test come[s] into play" for plaintiffs' fourth and eighth causes of action. 704 F.3d at 778 (quoting *Noel*, 341 F.3d at 1158).

> orders the state to take custody of his son. If
> the father sues in federal court for the return
> of his son on grounds that the state judgment
> violates his federal substantive due-process
> rights as a parent, he is complaining of an
> injury *caused by* the state judgment and
> seeking its reversal. This he may not do,
> regardless of whether he raised any
> constitutional claims in state court…. [And]
> if the state has taken custody of a child
> pursuant to a state judgment, the parent
> cannot escape *Rooker-Feldman* simply by
> alleging in federal court that he was injured
> by the state employees who took his child
> rather than by the judgment authorizing them
> to take the child. The example shows that in
> some circumstances, federal suits that
> purport to complain of injury by individuals
> in reality complain of injury by state-court
> judgments. The challenge is to identify such
> suits.

*Hoblock*, 422 F.3d at 87–88 (emphasis added). As this
example shows, a federal plaintiff can't avoid *Rooker-Feldman* by "clever pleading" because federal courts must
scrutinize complaints about a third-party's actions to
determine whether "the third party's actions are *produced by*
a state-court judgment and not simply ratified, acquiesced in,
or left unpunished by it." *Id.* at 88. It is clear that plaintiffs
here *are* "complaining of an injury caused by the state
judgment and seeking its reversal," and they "cannot escape
*Rooker-Feldman* simply by alleging … injur[y] by the state
employees who took [their] child[ren] rather than by the

judgment authorizing them to take the child[ren]." *Id.* at 87–88.**³**

Under the majority's very narrow view, *Rooker-Feldman* doesn't apply here because plaintiffs "are not requesting the return of their children." But as I've explained, the doctrine is not so narrow. It also covers requests for relief predicated on the results of a state court decision. *See Noel*, 341 F.3d at 1164; *Cooper*, 704 F.3d at 782. At the end of the day, plaintiffs are seeking money damages as a remedy for the harm produced entirely by the court-ordered removal of their children. The source of that harm is the state court judgment. Even the majority seems to recognize this on some level by acknowledging that "the true 'consequence[]' of the state court judgment is that [plaintiffs] lost custody of their children." *Rooker-Feldman* does not just preclude express requests that "a federal court … address th[at] consequence[]" by "reinstat[ing] [plaintiffs'] parental rights or vacat[ing] or otherwise revers[ing] the state court orders," as the majority holds today. For the doctrine to have its intended effect, it must also necessarily preclude requests for money damages designed to remedy the consequences of the state court ordering the removal of their children or terminating their parental rights, which is exactly what plaintiffs complained of here.

---

³ Other circuits are in accord. *See, e.g.*, *McCormick v. Braverman*, 451 F.3d 382, 393–94 (6th Cir. 2006) ("[I]f a third party's actions are the product of a state court judgment, then a plaintiff's challenge to those actions are in fact a challenge to the judgment itself."); *May*, 878 F.3d at 1005 ("Though the federal case may not be styled as an appeal of a state court judgment, *Rooker-Feldman* is not so easily bypassed. A claim that at its heart challenges the state court decision itself … falls within the doctrine.").

The majority thus misses the mark analytically when it says that plaintiffs "are not challenging the actions of the County officials that were 'pursuant to' or 'produced by' a state court judgment." Although certain actions by defendants might not have been "produced by" the state court's judgment, they certainly travel through it and can't be described as independent claims to avoid *Rooker-Feldman*'s reach. There is no denying that the fundamental injury in this case—the removal of plaintiffs' children—was in fact produced by the state court judgment. No amount of reframing the injury as the result of other causes—such as defendants' actions or arguments preceding the judgment—changes this reality because none of those causes could have led to the removal of plaintiffs' children absent the state court's judgment.

Such an overly narrow articulation of the *Rooker-Feldman* doctrine that ignores the true source of the asserted injury exists on an island. I'm not aware of any circuit that has gone so far to say that the only way for *Rooker-Feldman* to apply is when a federal plaintiff expressly asks to overturn the state court judgment. It is true that the other circuits, like ours, have appropriately recognized that *Rooker-Feldman* is a narrow doctrine. But respecting the narrowness of the doctrine doesn't mean effectively narrowing it out of existence as the majority does here.

Third, the majority contends that it doesn't reduce *Rooker-Feldman* to a mere pleading rule. But this assurance rings hollow. Under the majority's view, simply excising an express request for reversal of the state court judgment is enough to place plaintiffs "outside of *Rooker-Feldman* for that reason alone." That reduces the doctrine to a matter of careful pleading. Rather than actually explain why my concern wouldn't manifest, the majority just dismisses it

because "[t]here is nothing new about plaintiffs drafting complaints to account for jurisdictional … impediments." And even if pleading around *Rooker-Feldman* was problematic, the majority further writes that off because other procedural mechanisms, like issue preclusion, will fill in the gap. Even if true in practice (which I certainly hope), the availability of another procedural device doesn't give us license to effectively paper over *Rooker-Feldman* as the majority does. Indeed, the distinction between *Rooker-Feldman* and preclusion is important and must be preserved—in large part because the former is jurisdictional while the latter is not. *See Lance v. Dennis*, 546 U.S. 459, 466 (2006) ("*Rooker-Feldman* is not simply preclusion by another name."); *Exxon*, 544 U.S. at 284 (observing that *Rooker–Feldman* implicates federal courts' subject-matter jurisdiction); *see also Great W. Mining & Min. Co.*, 615 F.3d at 170 ("As *Exxon Mobil* makes clear, the *Rooker-Feldman* inquiry is distinct from the question of whether claim preclusion (res judicata) or issue preclusion (collateral estoppel) defeats the federal suit. Importantly, preclusion is not jurisdictional." (citation omitted)).

So what does the majority's decision mean going forward? Well, state court losers can now bring federal lawsuits challenging unfavorable state court judgments if they do just one of the following: (1) avoid expressly requesting reversal of the state court's decision or (2) simply allege that their opponent made false and misleading statements notwithstanding the fact that those statements were challenged in front of the state court. And either pleading strategy goes far beyond the narrow focus of my dissent: the exceedingly rare situation where a plaintiff *disclaims* extrinsic fraud. The majority's only response to this floodgates concern is to say that another tool, issue

preclusion, will prevent these lawsuits. I hope so. But I'm
still not sure why that gives the majority license to reduce
the *Rooker-Feldman* doctrine to a mere pleading standard in
this circuit.

\* \* \*

The majority misapplies *Rooker-Feldman* to this
admittedly unique case. Under the majority's rationale, a
losing party in state court could seek to remedy any injury
directly resulting from the state court judgment in federal
court so long as they recharacterize that injury as resulting
from their adversary's intrinsic fraud misleading the state
court, instead of from the state court judgment itself. What's
worse, the majority in reaching this conclusion reduces
*Rooker-Feldman* to a mere pleading requirement that is
easily circumvented.

*Rooker-Feldman* applies narrowly, yes, but it shouldn't
be a paper tiger. If plaintiffs were claiming some extrinsic
fraud that "'prevent[ed] [them] from presenting [their]
claim'" to the state court, I would readily agree with the
majority that *Rooker-Feldman* does not preclude federal
review. *Kougasian*, 359 F.3d at 1140 (citation omitted). But
plaintiffs disclaimed any extrinsic fraud. And they had
ample opportunity in the state court proceedings to counter
all the alleged *intrinsic* misstatements and omissions of
which they now complain. The state court considered
whatever responses the plaintiffs provided and simply
disagreed with them. Returning this case to the district court
to possibly provide a remedy for the state court removing
plaintiffs' children runs directly into *Rooker-Feldman*. It
also conflicts with precedents from our court and other
circuits in a case where it is not necessary to do so. I would
affirm the district court, and therefore respectfully dissent.